## BUNGE v. FIRST NAT. BANK OF MOUNT HOLLY SPRINGS, PA.

### No. 7595.

Circuit Court of Appeals, Third Circuit.

Feb. 27, 1941.

Douglass D. Storey, of Harrisburg, Pa. (John B. Pearson, of Harrisburg, Pa., Tanzer & Mullaney, of New York City, and Hause, Storey & Lick, of Harrisburg, Pa., on the brief), for appellant.

Mark E. Garber, of Carlisle, Pa., for appellee.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This case involves the responsibility of a bank to which a sight draft with bill of lading attached is sent for collection. The plaintiff is a resident of New York engaged in the business of selling wood pulp. In September, 1937, the plaintiff made an agreement for the sale of a quantity of wood pulp to the Mount Holly Paper Company of Mount Holly Springs, Pennsylvania. The pulp was to be shipped to the purchaser with sight draft attached to the bill of lading. Plaintiff shipped the wood pulp, consigned to himself, upon a uniform order bill of lading.[1] This he endorsed in blank and deposited, together with invoices for the pulp and a sight draft on the paper company to his order for $3,881.43, with the Irving Trust Company of New York City. On October 5, 1937, the Irving Trust Company sent the draft, invoices and bill of lading for collection to the defendant, a national bank located in Mount Holly Springs, Pennsylvania. Accompanying the documents was a collection sheet with the following instructions printed thereon: "If not paid when due please return notes and clean drafts but hold documentary items informing us immediately of reason for nonpayment. Deliver documents only on payment of draft, unless otherwise instructed by us."

Upon receipt of the documents the Mount Holly Springs bank notified the purchaser of their arrival. Shortly thereafter a representative of the purchaser came to the bank and delivered to it the purchaser's check drawn on the Farmers Trust Company of Carlisle, Pennsylvania, for the amount of the draft. Defendant's officer perforated the draft with the word "Paid" and surrendered it, the bill of lading and the invoices to the purchaser who thereupon delivered the bill to the railroad company and received possession of the pulp. Later the same day, an officer of the paper company notified the bank that it would not accept the pulp and would not make good its check upon the Carlisle bank which had been given in payment of the draft. The paper company did not have, at the time the check was given, sufficient funds in that bank to cover the check. The next day was a holiday. On the following day the paper company obtained possession of the bill of lading from the local agent of the railroad company and gave it back, together with the cancelled draft and in-

---

[1] The bill of lading stated on its face: "The surrender of this original Order Bill of Lading properly endorsed shall be required before the delivery of the property. Inspection of property covered by this bill of lading will not be permitted unless provided by law or unless permission is indorsed on this original bill of lading or given in writing by the shipper."

voices, to the defendant bank. The bank thereupon returned the check to the paper company and returned to the Irving Trust Company the bill of lading, cancelled draft and invoices, and the Irving Trust Company charged the seller's account with the amount of this draft. This action was brought by the seller against the Mount Holly Springs bank for the amount of the draft. It was tried below by the court without a jury and findings of fact and conclusions of law were made. Judgment was for the defendant.

Plaintiff's theory is that when the defendant bank accepted the purchaser's check and delivered therefor the bill of lading, invoices and draft, the latter duly cancelled, this became a closed transaction with defendant bank becoming personal debtor. Subsequent events, plaintiff argues, do not change the nature of the transaction nor can they lessen plaintiff's rights.

██ Unless the Bank Collection Act of June 12, 1931, P.L. 568, 7 P.S. § 212 et seq., has changed the law, plaintiff's position is right under the law of Pennsylvania. "* * * except where there is a custom to the contrary, a direction to collect a debt does not of itself include an authorization to receive anything but money in payment thereof." Restatement, Agency § 426, Comment e. The Pennsylvania law governing the consequences of such deviation from authority on the part of an agent is stated in Pennsylvania annotations to the Restatement of Agency, § 426. "It appears to be the law in Pennsylvania, at least in bank collection cases, that if an agent receives something other than money the agent becomes immediately liable to the principal for the full amount of the indebtedness, the burden being on the agent to recover whatever he can from the debtor." An examination of the following authorities supports the rule thus stated: Fifth National Bank v. Ashworth, 1889, 123 Pa. 212, 16 A. 596, 2 L.R.A. 491; Farmers' & Mechanics' National Bank v. Cuyler, 1901, 18 Pa.Super. 434; Bank of Wesleyville v. Rose, 1925, 85 Pa.Super. 52. See also Pepperday v. Citizens' Nat. Bank of Latrobe, 1898, 183 Pa. 519, 38 A. 1030, 39 L.R.A. 529, 63 Am.St.Rep. 769. The Pennsylvania rule in these cases is thus somewhat more severe than that in some other states where recovery against the agent is limited to the loss caused by his negligence. Mechem on Agency, 2d Ed., § 1320. Even under this rule, however, in a collection case prima facie the measure of damages is the amount of the claim. Mogul v. Lavine, Inc., 247 N.Y. 20, 159 N. E. 708, 57 A.L.R. 934; Mechem § 1320. The defendant, then, became liable as debtor when it took the paper company's check and surrendered the draft and the document of title. Once that liability attached the defendant could not unilaterally discharge it by an attempt to retrace its steps. Hamburger Bros. & Co., Inc., v. Third Nat. Bank & Trust Co. of Scranton, 1938, 132 Pa.Super. 421, 200 A. 696, affirmed in 1939, 333 Pa. 377, 5 A.2d 87.

██ We now come to the effect of the Bank Collection Act.[2] Section 9 of that Act provides: "Where ordinary care is exercised, any agent collecting bank may receive in payment of an item without becoming responsible as debtor therefor, whether presented by mail, through the clearing house, or over the counter of the drawee or payor, in lieu of money, either (1) the check or draft of the drawee or payor upon another bank * * *." It was found by the trial court that the defendant bank exercised ordinary care in accepting the Mount Holly Paper Company's check in payment of the draft in question. If the statute is applicable defendant bank would not have incurred liability as a debtor by the acceptance of the paper company's check. In determining whether the act applies to this situation we must blaze our own trail. There seems to be no decision in which a court has had to meet this question and there is no legislative history or authoritative commentary upon the statute which gives a guide to its interpretation. The language used in § 9, however, seems pretty definitely directed to instances where the paper to be collected is that embodying a promise of or an order upon a banking institution. Presentation by mail, through the clearing house or over the counter certainly sounds like a description of a presentation to a bank. So does the permissive acceptance of a check or draft "upon any bank other than the drawee or payor of the item". So does the elaborate provision dealing with unconditional credit.

In addition to the words of the section just quoted a strong reason for limiting the language of § 9 to interbank transactions is the startling effect upon those dealings

---

[2] Act of June 12, 1931, P.L. 568, 7 P.S. § 220.

430

in which a seller accompanies an endorsed order bill of lading or other negotiable title document with a sight draft. This method of dealing has made it possible for parties to have the equivalent of a cash sale even though buyer and seller are hundreds of miles apart. To interpret this statute to change that kind of arrangement from a cash transaction to what is a credit transaction would be to destroy what has come to be an accepted and useful commercial device. Unless the language explicitly calls for that result it should not be reached. We believe, as stated above, that the language strongly points the other way. The conclusion is that the defendant bank became liable for the amount of the draft when it received something other than money in payment, cancelled the draft and delivered it to the drawee.

The judgment of the District Court is reversed and the case is remanded, with directions to enter judgment for the plaintiff.

JONES, Circuit Judge (concurring).

I fully concur in the judgment of the court but do so upon the ground that the Pennsylvania Bank Collection Act,[1] by its own requirements, is unavailing to relieve the defendant bank of its common-law liability under the undisputed facts of the case. Had the defendant bank, as the collecting agent, endorsed and transmitted to the drawer of the draft the check which the drawee originally gave the defendant in payment, a question as to the applicability of the act might have been raised. The intent and scope of the act would then have become important. But, such is not this case. The defendant bank transmitted nothing to the drawer of the draft in intended payment thereof. After having surrendered the draft with attached bill of lading (and, by the same token, the goods covered thereby) to the drawee of the draft in exchange for the latter's check, the defendant returned the check to the drawee of the draft upon receiving back the bill of lading and then returned the draft to the forwarding agent as having been dishonored for nonpayment. The defendant bank does not rely upon a collection of any kind. The act, therefore, is in no way applicable and the defendant's liability under the law merchant must be enforced. Cf. Stewart v. Pen Argyl National Bank, 307 Pa. 328, 335, 161 A. 327 et seq.

[1] Act of June 12, 1931, P.L. 568, Sec. 9, 7 P.S. § 220.